### In re McCULLOUGH AND COMPANY, Debtor.

#### Bankruptcy No. 96–42076.

United States Bankruptcy Court, W.D. Missouri.

Aug. 19, 1996.

---

4. The Court cannot conceive that this debtor would receive a real estate license.

John E. Larson, for McCullough and Company.

Rebecca McGinnis, Kansas City, MO, for Petitioner Acme Sheet Metal Works, Inc.

Patrick Dunn, for Petitioner Cox Air Systems, Inc.

Frank B.W. McCollum, for Petitioner Axia, Inc. d/b/a Fischbein Co.

## ORDER

FRANK W. KOGER, Chief Judge.

On June 24, 1996, three of McCullough and Company's creditors, Cox Air Systems, Inc., Acme Sheet Metal Works, Inc., and Axia, Inc. d/b/a Fischbein Co., (hereafter "Cox," "Acme," and "Axia," respectively) brought an involuntary chapter 7 petition against Debtor McCullough and Company. Debtor has filed an Answer to Involuntary Petition in which it requests the Court to refuse to order relief against it, to dismiss the involuntary petition, and for such other relief as the Court deems proper.

According to the evidence before the Court, Debtor is a family business which began operations in 1954 and which was incorporated in Missouri in 1973. Until recently, Debtor was a successfully operated business engaged in, among other things,

distributing sewing machines and related equipment. A few years ago, however, an unfortunate turn of events began to cause the business to experience financial difficulty.

According to the debtor, in 1993, it hired an outside sales and marketing manager to begin taking over some of the responsibilities of Bob McCullough, the company's president at the time. Unfortunately, however, the relationship with the new manager did not work out as well as the debtor had hoped. In order to make his sales appear good, the new manager began to sell the debtor's products at or below the company's cost, resulting in a loss to the company. Compounding the problem was that at the same time, the company's bookkeeper experienced a family illness and the accounting fell several months behind. As a result, the company was not aware of the damage that the new manager was causing until several months later, after the problem was nearly incurable. The company suddenly had a serious cash flow problem and was unable to pay its suppliers and other debts as they became due.

The cause of the debtor's sudden business downturn is not relevant to the issue at hand, so the Court will not go into further detail, but in any event, sometime in late 1994 to Spring, 1995, the debtor became unable to pay its debts. Creditors were no longer allowing Debtor to buy on credit and several of them ceased doing business with the debtor. Furthermore, First State Bank, who held a note secured by the company's assets as well as significant personal assets of Bob McCullough, called its note sometime in early to mid–1995.[1] As Debtor was unable to pay the debt, the bank seized the collateral which had been pledged on the note. The bank seized all of the funds out of the debtor's operating account, but most of the collateral seized consisted of personal assets pledged by Bob McCullough.[2] This left the debtor without any operating funds and the company's financial crisis became irreparable.

Following the bank's seizure of the company's operating account and Bob McCullough's personal assets, on August 1, 1995, the debtor company signed a note securing the debt owed to Bob McCullough personally for the assets seized by the bank, giving Bob McCullough a security interest in all of the debtor's assets, including, among other things, accounts receivable, contract rights, inventory and equipment.

Meanwhile and over the next several months, the debtor's creditors began obtaining judgments in circuit and associate circuit courts against the debtor. On February 1, 1996, Bob McCullough resigned as president of the company and his daughter, Janet McCullough, who had previously been the company's secretary, became president of the company. On February 13, 1996, the company entered a voluntary surrender or repossession agreement with Bob McCullough, under which all of the assets of the company were transferred to Bob McCullough. The company's assets were valued at the same amount as Bob McCullough's security interest, $257,864.82.[3] As a result, all of the company's assets as of February 13, 1996, were transferred to Bob McCullough on that date.

On February 26, 1996, the directors of the debtor company, Janet McCullough and her brother, Jeff McCullough, decided to dissolve the company. Articles of Dissolution were filed with the Missouri Secretary of State's Office on February 28, 1996. The company has proceeded with the winding up of affairs and liquidation of the company. The debtor concedes that the creditors will receive little, if any, of their claims in the liquidation.

---

1. There is some question as to when the bank called the note and seized the securing assets. Janet McCullough testified it occurred in June, 1995, although it may have occurred as early as February, 1995. In any event, this distinction is not relevant here.

2. The bank seized $19,000 out of the company's operating account as well as $111,000 worth of Union Electric stock personally owned by Bob McCullough and $42,000 out of his personal bank account.

3. The debt to Bob McCullough was listed as follows:

| | |
|---|---|
| B.L. McCULLOUGH—PRINCIPAL | $247,321.44 |
| INTEREST AS OF FEB. 8, 1996 | 10,272.33 |
| 5 DAYS INTEREST @ 54.21 | 271.05 |
| | $257,864.82 |

As stated above, three of the debtor's creditors have brought an involuntary chapter 7 petition against the debtor. Since there are very few, if any, assets left for distribution to the creditors in the dissolution, it is obvious that by bringing this petition, the creditors hope to have the transfer to Bob McCullough (and perhaps some other transfers made to creditors) avoided on some bankruptcy ground, so they can share those funds on a pro rata basis. The issue as to whether or not that transfer could, in fact, be avoidable under the Bankruptcy Code is not an issue before the Court now, and the Court passes no judgment on that issue at this time. Rather, the only issue before the Court now is whether the law allows the creditors to bring an involuntary petition against the debtor in the first place.

■ Naturally, the debtor, who is only a few weeks from the expiration of the claims period in the dissolution proceedings, and thus only a few weeks from final liquidation, opposes the bankruptcy petition. Debtor contends the petition should be dismissed because it filed its Articles of Dissolution with the Missouri Secretary of State's Office on February 28, 1996, and has been proceeding with the orderly liquidation of its remaining assets and the winding up of its affairs since that time. Pursuant to R.S.Mo. § 351.478, the debtor notified all creditors of the dissolution and claims procedure, requiring them to file their claims on or before September 4, 1996. Furthermore, Debtor states it intends to distribute its remaining assets to its creditors who have timely filed their claims as required under R.S.Mo. § 351.478.[4] However, as mentioned previously, Debtor concedes there will be very little, if any, assets remaining for liquidation and distribution to creditors.

Essentially, Debtor contends that because it is involved in the state dissolution proceedings, it is not subject to having an involuntary bankruptcy brought against it.

11 U.S.C. § 303(h)(1) permits the Court to order relief against the debtor in an involuntary case only if the debtor is "generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute." Debtor alleges that the "Missouri Corporation Code" governing the dissolution and liquidation of corporations does not affirmatively require payments to creditors to be made prior to the end of the claims period. In fact, as Debtor submits, in a dissolution proceeding, it would be impossible to calculate and pay creditors on a pro rata basis until the expiration of the claims period and receipt of all claims.

According to Debtor, since the dissolution law does not require payment of creditors until the expiration of the claims period and it would be impossible to make such payments until the expiration of the claims period, if a corporation has filed Articles of Dissolution, "[o]nly upon the expiration of the claims period and failure to pay creditors' claims could a creditor allege under § 303 of the Bankruptcy Code that the 'debtor is generally not paying such debtor's debts as such debts become due.'" In other words, the expiration of the claims period becomes the time when the debts of the corporation "become due."

Thus, it is Debtor's contention that its debts will not become due until the expiration of the claims period in its dissolution proceedings (September 4, 1996), so an involuntary petition cannot be filed against it unless and until it fails to make those payments at the expiration of that claims period. As a result, Debtor contends it does not satisfy the 11 U.S.C. § 303 requirement that it be generally not paying its debts as they become due because its debts do not become due until September 4, 1996, the expiration of the claims period.

■ In reply, the petitioning creditors state that the debts were due back in 1995, not at the end of the claims period, and that debtor has been generally failing to pay its debts as they were due for some time and in the normal course of the debtor's business. Clearly, the petitioners have sufficiently established that Debtor has not been paying its debts as they became due (in the usual sense) as there is substantial evidence in the

---

4. As the petitioners point out, Debtor's intent to distribute its assets and perform an orderly liquidation is irrelevant to whether the petitioners can bring an involuntary petition in bankruptcy.

record that Debtor was not paying its obligations throughout 1995: Acme received a default judgment against the debtor on a Petition on Account in Associate Circuit Court of Jackson County for $25,000 on February 6, 1996; Cox Air Systems was awarded $12,394.23 in a default judgment against the debtor on January 8, 1996; and Axia was awarded $215,000 in a judgment against the debtor on January 24, 1996. According to the testimony at trial, all of these debts became "overdue" in the spring and summer of 1995. In addition, the petitioning creditors submit that at least four other creditors have obtained default judgments against the debtor in Jackson County between December, 1995, to March, 1996, for debts that became due in 1995, and Debtors have more than 80 creditors who have not been paid.

Thus, the evidence clearly supports the finding that the debtor has generally not been paying its debts when they come due. There is no provision in the Missouri statutes providing that the filing of Articles of Dissolution changes the date at which a corporation's debts become due and the Court has found no support for the proposition that a corporation's debts become due at the expiration of the claims period. As a result, Debtor's argument that it does not fall within 11 U.S.C. § 303 fails.

Next, Debtor contends the petitioning creditors are further barred by the dissolution of the corporation and their failure to properly petition the Secretary of State's Office for reinstatement of the corporation pursuant to R.S.Mo. § 351.488 prior to the filing of the involuntary petition. According to Debtor, until it is reinstated as a corporation, it must be considered a dissolved corporation and therefore does not fall within the definition of "debtor" provided in § 101(13).

Debtor is incorrect on this point as well. As this Court said in In re Anderson, 94 B.R. 153, 156 (Bankr.W.D.Mo.1988):

In the context of voluntary bankruptcy, the United States Supreme Court has consistently held that a corporation's ability to avail itself of the bankruptcy laws depends on how the state in which it was incorporated defines its existence after dissolution. *Persons who may be debtors under Chapter 7 and the subject of an involuntary bankruptcy proceeding include dissolved corporations.* Courts have uniformly held, however, that a voluntary or involuntary Chapter 7 petition may only be filed against a dissolved corporation that is still in existence. This rule of law is consistent with 11 U.S.C. § 303(a) which provides that an involuntary chapter 7 petition can be filed against a "moneyed, business, or commercial corporation" if the corporation could have filed a voluntary chapter 7 petition.

(Emphasis added, citations omitted.) Although *Anderson* involved a different factual situation (it involved a foreign corporation which had forfeited its corporate right in Missouri), the rationale also applies to a Missouri corporation in the process of dissolution.

We thus turn to Missouri law to determine whether the debtor is "still in existence." R.S.Mo. § 351.476 and 351.468 define the existence of a corporation after dissolution in Missouri. Section 351.476.1 provides that "[a] dissolved corporation continues its corporate existence but may not carry on any business except that appropriate to wind up and liquidate it business and affairs." In addition, § 351.476.2(5) provides that dissolution of a corporation does not "[p]revent commencement of a proceeding by or against the corporation in its corporate name." It seems clear, then, that the Missouri law defining a corporation's existence states that the debtor is "still in existence" and therefore mandates that it may be the subject of an involuntary dissolution petition. See *Mabin Constr. Co. v. Historic Constructors, Inc.*, 851 S.W.2d 98, 103 (Mo.Ct.App. 1993).

The situation at bar is similar to the situation in *First Nat. Bank of Liberal v. Liberal Mack Sales, Inc. (In re Liberal Mack Sales, Inc.)*, 24 B.R. 707, 710 (Bankr. D.Kan.1982), cited by this Court in *Anderson*. In *Liberal Mack Sales*, the United States Bankruptcy Court for the District of Kansas applied Kansas corporation law and held that because the involuntary chapter 7 petition was filed against the dissolved

corporation well within the three-year period in which the dissolved corporation had to wind up its affairs, the petition was proper and the debtor was subject to the involuntary bankruptcy proceeding. 24 B.R. at 711. While Missouri law does not have such a three-year period, the petitioners in the case at bar have brought their petition within the period allowed by Missouri law for winding up of the debtor's affairs, and therefore, the petition is proper and Debtor is subject to the involuntary bankruptcy proceeding.[5]

Finally, Debtor contends that the dismissal of the involuntary petition would result in the prompt and efficient liquidation of its assets and pro rata payment to creditors under the corporate dissolution, whereas ordering the relief sought in the involuntary petition would result in substantial additional expense and delay in payment of the creditors' claims in bankruptcy. Debtor asserts that this Court should therefore abstain, pursuant to its authority under § 305, from allowing the involuntary petition to be brought by the petitioners.

Section 305 provides:

(a) The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if—

> (1) the interests of creditors and the debtor would be better served by such dismissal or suspension....

Debtor asserts that both its interests and the creditors' interests will be better served through the corporate dissolution proceedings than they will in these bankruptcy proceedings because the administration of the bankruptcy will result in fewer funds being available to the creditors. Debtor cites *In re Wine & Spirits Specialties of Kansas City*, 142 B.R. 345 (Bankr.W.D.Mo.1992), in which this Court exercised its power to abstain from taking jurisdiction under § 305. Debtor contends *In re Wine & Spirits* is factually

similar to the case at bar because in that case, the debtor had been engaging in a voluntary liquidation of its assets and had been paying its sole secured creditor substantial amounts of its debt from the proceeds. In fact, in that case this Court found that the debtor had shown its good faith by conducting a liquidation of its assets and applying very substantial amounts of the proceeds therefrom to their secured debt and that by the time of the hearing, two-thirds of the debtor's inventory had been liquidated. *Id.* at 347. In the case at bar, Debtor contends it has likewise shown a good faith effort in conducting its liquidation and paying its secured creditor, Bob McCullough. However, *In re Wine & Spirits* is clearly distinguishable.

This Court specifically noted in *In re Wine & Spirits:*

> The paradigm case as described in the legislative history is a case where an out-of-court arrangement is being worked out which is satisfactory to most of the creditors and a small group of recalcitrant creditors files an involuntary case to put leverage on the debtor. H.Rep. No. 595, 95th Cong., 1st Sess. 325 (1977).

*Id.* In *In re Wine & Spirits*, this Court found that while that case was not the paradigm abstention case, abstention would best serve the interests of both the creditors and the debtor. *Id.* In that case the only creditor petitioning for involuntary bankruptcy was the sole secured creditor and none of the unsecured creditors joined in bringing the involuntary petition. *Id.* In fact, the only other creditor which did respond indicated his disapproval of the involuntary petition and expressed his preference that the debtor proceed with the voluntary liquidation. *Id.* This Court also noted "the absence of any indication that nervous creditors are rushing to the courthouse to file state court collection actions against Wine and Spirits." *Id.*

---

**5.** The Court also rejects the debtor's assertion in its post-trial memorandum that the creditors are barred from seeking relief in bankruptcy because they filed their claims in the state dissolution proceedings. The creditors' petition in bankruptcy does not frustrate the operation of the statutory dissolution process as Debtor claims it does and as discussed, *supra,* the creditors are

allowed to bring such a petition. Further, there is no support for the debtor's contention that "the creditor has chosen its remedy in becoming part of the [state] dissolution and should be barred from filing the involuntary bankruptcy petition until, at the very earliest, the day after the claim date when it has not been paid through the dissolution."

The case at bar presents a different situation. This is neither the paradigm abstention case nor a situation where the creditors will benefit from abstention. Here, four significant creditors brought this involuntary petition. No creditors have expressed satisfaction with the current liquidation proceedings, although presumably Bob McCullough is satisfied. Furthermore, at least eight creditors have obtained judgments in state court and none of the creditors have expressed their confidence in the debtor's good faith and ability to conduct a self liquidation.[6]

Moreover, and rather significantly, the potential avoidance of the substantial transfer to Bob McCullough was not present in *In re Wine & Spirits*. While it is true that allowing the involuntary petition to proceed will result in additional expense and delay in the winding up of the final affairs of the debtor, the debtor has conceded that under the corporate dissolution proceedings, the creditors will receive little, if anything at all.[7] The debtor owes its eighty-some creditors approximately $440,000. If, in fact, the creditors could be successful in avoiding the $257,-864.82 transfer to Bob McCullough, as well as any other possible avoidable transfers, the payout to the creditors would be significantly higher in bankruptcy than the payout will be under the state corporate dissolution. As a result, the creditors stand to benefit greatly if their bankruptcy petition is allowed, and Debtor's assertion regarding the expense and delay of allowing the bankruptcy petition does not overcome the petitioners' right to have the Court hear its case on avoiding any improper transfer.

For the foregoing reasons, the petitioners will be allowed to bring its involuntary chapter 7 petition against Debtor McCullough and Company and the case shall proceed accordingly.

The foregoing Memorandum Order constitutes Findings of Fact and Conclusions of Law as required under Fed.R.Bankr.P. 7052.

So ORDERED.

---

6. Regarding the issue of the debtor's good faith and ability to conduct a liquidation, Debtor attempts to justify the creditors' dissatisfaction with its self liquidation proceedings by stating it is not permitted to liquidate under the state dissolution statutes until the expiration of the claims period. However, this is not particularly helpful to Debtor because, again, it concedes there will be little to liquidate and distribute at the expiration of the claims period, and there are allegations that improper or avoidable transfers were made by the debtor.

7. Debtor asserted in its post-trial memorandum that like the situation in *In re Wine & Spirits*, the unsecured creditors will receive a larger distribu-

tion if the debtor is allowed to liquidate its assets out of bankruptcy, because "if the Debtor's property is sold at a trustee's sale, potential buyers of the assets will wait and pick up the equipment and inventory at fire-sale prices" and that "[i]t is more economically efficient to permit the Debtor to sell its assets out of bankruptcy so that it can maximize the distributions to the unsecured creditors." This assertion is contradicted by the evidence, however, in that the debtor conceded at trial that the only assets left are a few accounts receivable. There is no equipment or inventory left to be sold: it was all transferred to Bob McCullough.